CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

SEP 1 3 2010

JULIA C. DUDLEY, CLERK
BY: _J. Clay_
DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ROANOKE DIVISION

| | |
|---|---|
| KAMAL MUWWAKKIL, ) | Case No. 7:09CV00318 |
| Plaintiff, ) | |
| ) | |
| v. ) | **MEMORANDUM OPINION** |
| ) | |
| ) | |
| GENE M. JOHNSON, ET AL., ) | By:   Hon. Glen E. Conrad |
| ) |    Chief United States District Judge |
| Defendants. ) | |

Plaintiff Kamal Muwwakkil, a Virginia inmate proceeding pro se, brings this action as a

civil rights complaint pursuant to 42 U.S.C. § 1983, with jurisdiction vested pursuant to 28

U.S.C. § 1343. In his complaint, Muwwakkil raises twelve claims, alleging that prison officials

at Wallens Ridge State Prison violated his federally protected rights by failing to accommodate

his religious practice, in violation of the First Amendment and the Religious Land Use and

Institutionalized Persons Act (RLUIPA), by retaliating and discriminating against him, and by

imposing unconstitutional living conditions upon him. Defendants filed dispositive motions,[1]

and Muwwakkil responded, making the matter ripe for decision. Upon review of the record, the

court finds that defendants' motions must be granted.

### I. Background

Muwwakkil was received as an inmate at Wallens Ridge on July 2, 2008. Wallens Ridge

is a Level 5 maximum security prison that houses inmates who are classified as high security

risks and are serving lengthy sentences. The average daily population at Wallens Ridge is 1200

inmates. Inmate movement within this facility is limited due to serious safety and security

concerns.

Many of Muwwakkil's claims center around his allegation that he is imam of the Sunni

Muslim inmates at Wallens Ridge. As provided in the Wallens Ridge offender orientation

---

[1] Defendants Johnson, Huffman, Garman, Shear, Watson, Harvey, Scarberry, McQueen, McBride, Ravizee, and Mitchell have filed a motion for summary judgment, supported by affidavits and other documentation. Defendant Thompson has filed a motion to dismiss.

handbook, inmates assigned to the general prison population may choose to participate in group religious services inside the housing unit during the time period allotted for outside recreation. When attending such services, inmates may take a Bible or Quran with them, but are not allowed to carry any other materials. One-hour long religious group meetings are also allowed in the prison gymnasium between the hours of 9:00 a.m. and 3:00 p.m. No more than 88 inmates may participate in one group meeting and each inmate must make a prior request to the chaplain to conduct or attend such a meeting. Protestant services are held every Wednesday, Catholic services are held on the Fourth Saturday of each month, Jehovah's Witness meetings are held on the first and second Saturday of each month, and Muslim services are held every Friday. Only inmates whose names appear on an approved list may attend group religious services in the gymnasium.

## II. Discussion

### Claim 1: Change of Prayer Service Time

According to Louis B. Cei, Special Programs Manager for the VDOC, VDOC administrators receive guidance concerning accommodation of Muslim inmates' faith practices from the Muslim Chaplain Services of Virginia (MCSV). The Jumu'ah prayer service is a Muslim midday prayer of the week, which is held every Friday. Based on information received from Asghar Goraya of the MCSV and the Islamic Center of Virginia, the VDOC recommends that its prison facilities schedule the start time for the Jumu'ah prayer event between 11:30 a.m. and 2:00 p.m. each Friday, depending on the operations and needs of the individual facility. Cei is not aware that an inmate requires any special property items in order to participate in the Jumu'ah prayer service. Nevertheless, VDOC policy allows Muslim inmates to bring the Quran or the Muslim Prayer Ritual to the service. Cei's information also indicates that although the Jumu'ah service is usually a congregational prayer, an individual may also carry out the service on his own.

- 2 -

At the time Muwwakkil arrived at Wallens Ridge, Sunni Muslim inmates were allowed to meet in the gymnasium each Friday from 1:30 p.m. to 2:30 p.m. for the weekly Jumu'ah service. He was soon approved to attend these meetings and regularly did so. In November 2008, the prayer service time at Wallens Ridge was changed, so that, for the winter months, the service began at 12:00 p.m. and ended at 1:00 p.m. Defendants offer evidence that prison administrators made this schedule change at the request of inmate representatives for the Sunni Muslim inmate community at Wallens Ridge, who assured staff that the change would suit their religious requirements. Muwwakkil was not one of the inmates who took part in this discussion, and he presents a petition, signed by numerous inmates, asserting that they are members of the Sunni community who did not agree to the time change. In March 2009, the schedule changed so that the service was held from 1:00 p.m. to 2:00 p.m. for the spring and summer months and from 12:00 p.m. to 1:00 p.m. for the fall and winter months.

In Claim 1, Muwwakkil alleges that the change to the Jumu'ah prayer time in November 2008 violated his rights under the First Amendment and the Religious Freedom Restoration Act (RFRA).[2] Defendants argue that this claim must be dismissed with prejudice, pursuant to 42 U.S.C. § 1997e(a), because Muwwakkil failed to exhaust his administrative remedies within the time limits of the VDOC adult grievance procedures.

The Prison Litigation Reform Act provides that "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. § 1983] or any other Federal law, by a prisoner confined in any jail, prison or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a) (emphasis added). It is well established that this exhaustion requirement is mandatory, Anderson v. XYZ Correctional Health Services, Inc., 407 F.3d 674, 677 (4th Cir. 2005), and that the requirement "applies to all inmate suits about prison

---

[2] The United States Supreme Court has held that RFRA is unconstitutional as applied to state institutions. See City of Boerne, 521 U.S. 507 (1997). Therefore, to the extent that Muwwakkil brings his claim under RFRA, defendants are entitled to summary judgment as a matter of law. In other parts of his complaint, however, Muwwakkil indicates that he is raising his religious claims under RLUIPA.

life." Porter v. Nussle, 534 U.S. 516, 532 (2002). Failure to exhaust all levels of administrative review within the time limits set by the procedures is not "proper exhaustion" and will bar an inmate's § 1983 action. Woodford v. Ngo, 548 U.S. 81, 90 (2006).

The VDOC inmate grievance procedure, Division Operating Procedure (DOP) 866, sets forth the procedures an inmate must follow in order to exhaust the DOP's available remedies. Officials explain the DOP 866 procedures to each inmate as he enters the VDOC, and a copy of the DOP is available for an inmate to review upon request. To exhaust his remedies, an inmate must first make a good faith effort to resolve the issue informally. If this process is unsuccessful, the inmate must then file a regular grievance within 30 days of the official action he is challenging. The warden or his designee responds to this Level I of the grievance procedure. If the inmate fails to file the regular grievance within the allotted time, the grievance coordinator will reject it as untimely filed. The inmate can then appeal the intake decision.

Muwwakkil agrees with the defendants' evidence that he did not file a regular grievance about the November 2008 Jumu'ah time change until February 2009. Because this filing occurred well outside the 30-day window for filing a timely regular grievance under DOP 866, the grievance coordinator rejected it as untimely filed. Muwwakkil states that he did not file a grievance about the time change immediately after it happened, because he respected the authority of the inmate who then served as imam of the Sunni Muslim community at WRSP and gave this inmate an opportunity to work out the problem with prison officials. After Muwwakkil himself was elected imam in December 2008, he then sought to resolve the time change issue informally with prison authorities by sending letters and proposals to the warden, the chaplain, and other officials. When he was unsuccessful using these methods, he began taking the necessary steps under DOP 866 to exhaust administrative remedies, by filing an informal complaint in January 2009 and then, a regular grievance in February 2009. This explanation of Muwwakkil's delay in pursuing a grievance does not, however, indicate any basis for finding that he properly exhausted administrative remedies available to him in November 2008 or that any

- 4 -

state official's action prevented him from doing so. Because Muwwakkil failed to exhaust his administrative remedies within the allotted time limits under the DOP, he failed to exhaust properly as to Claim 1 and as such, failed to comply with § 1997e(a). Woodford, 548 U.S. at 87. Accordingly, the defendants are entitled to summary judgment as a matter of law as to Claim 1.

## Claim 2: Out of Cell Exercise

Muwwakkil complains in Claim 2 that although established VDOC recreational program guidelines state that inmates in the general population will receive one hour of recreation outside their "living area" seven days a week, in fact, such inmates receive outside exercise only every other day.[3] He asserts that while he has been incarcerated at Wallens Ridge, inadequate exercise has caused him to "suffer serious physical and mental injuries [including] migraines, anguish, and muscle atrophy."

The Eighth Amendment protects prisoners from cruel and unusual living conditions. Rhodes v. Chapman, 452 U.S. 337 (1981). In order to state a claim of constitutional significance regarding prison conditions, a plaintiff must allege facts demonstrating (1) that the challenged conditions resulted in a deprivation of a basic human need that was objectively "sufficiently serious" and (2) that, subjectively, the defendant prison officials acted with a sufficiently "culpable state of mind" with regard to the conditions. Wilson v. Seiter, 501 U.S. 294, 298 (1991). To satisfy the objective element of a conditions claim, the plaintiff must show that he has sustained a serious or significant mental or physical injury as a result of the challenged conditions. Strickler v. Waters, 989 F.2d 1375, 1380-1381 (4th Cir. 1993). To satisfy the subjective element of a conditions claim, plaintiff must show that the defendant officials acted with deliberate indifference toward the risk of harm–that the official was aware of facts from which he could draw an inference that a substantial risk of harm existed, that he actually drew

---

[3] To the extent that Muwwakkil complains that the recreation provided at Wallens Ridge violates VDOC policy, he alleges merely a violation of state law, which is not actionable under § 1983. See Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985). In any event, the record indicates that the Wallens Ridge rotation system of out-of-cell recreation one day and outside recreation the next day is in compliance with VDOC policy as Muwwakkil himself states it.

that inference, and that he disregarded the risk by failing to take "reasonable measures" to alleviate it. Farmer v. Brennan, 511 U.S. 825, 835-37 (1994).

Defendants' evidence indicates that general population inmates at Wallens Ridge are afforded an hour of recreation seven days each week. Because there are more than 1000 general population inmates, outside recreation is alternated between the pods so that each general population pod has the opportunity to go outside approximately every other day. On alternate days, the inmates may participate in out-of-cell activities in the pod. The rotation of outdoor recreation is based on the security needs of the facility and is designed to reduce communications and contraband moving between the pods. Segregation inmates, on the other hand, are afforded one hour of outside recreation five days each week in a one-person fenced area.

Muwwakkil fails to forecast evidence on which he could satisfy the elements of an Eighth Amendment conditions claim. First, he does not dispute defendants' evidence that while in the general population, he was offered one hour of out-of-cell recreation time every day, with alternating in-pod activity and outside recreation approximately every other day. After his transfer to segregation, officials afforded him an opportunity for one hour of outside recreation each weekday. Hence, he fails to demonstrate that he has been deprived of opportunities to exercise outside his cell every day.

Second, his own evidence indicates that he voluntarily chose to forego outside recreation opportunities at least once or twice per week in order to participate in religious services during the recreation period. He also admits that he did not always participate in the segregation unit recreation, because he did not like the recreation cages provided. Defendants cannot be held liable for his lack of recreation on days when it was offered and he chose not to participate.

Third, Muwwakkil presents no evidence on which he could prove injury related to inadequate recreation. The record indicates that he never sought medical treatment or mental health treatment for any of the conditions allegedly caused by inadequate recreation. Because he fails to demonstrate that the recreation program at Wallens Ridge deprived him of any basic

human need or caused him any serious injury, the court finds no genuine issue of material fact in dispute. Strickler, 989 F.2d at 1380-1381. The defendants are, thus, entitled to judgment as a matter of law, and the court will grant their motion accordingly.

## Claim 3: Cold Cell Temperatures

In this claim, Muwwakkil alleges that from December 3, 2008 through January 28, 2009, prison officials housed him in a cell that was uncomfortably cold, in violation of the Eighth Amendment. Inmates must address maintenance complaints to the Building supervisor, who issues work orders to maintenance staff members as he sees fit. Such work orders are ordinarily to be addressed and closed within 15 days, and staff members strive to complete these orders within two days. If a part must be ordered, however, completion of the work order may take as long as 60 days. The thermostats in the housing units are set to 70 degrees and are checked routinely to maintain this temperature year round. Employees in each unit keep a temperature log.

Records indicate that Muwwakkil was housed in Cell D-628 from December 3-18, 2008, and was moved to Cell C-619 on December 18, 2009. The temperature log in D-6 pod for December 3-18, 2009 indicates temperatures ranging from 70 to 73 degrees. The log in C-6 pod from December 18, 2008 to January 28, 2009 indicates a range from 69 to 74 degrees. The record does not indicate that Muwwakkil filed any complaints about being cold in his cell until January 20, 2009. Maintenance staff checked the cell on January 23, 2009 and adjusted the vents to ensure adequate air flow into the cell. Muwwakkil filed a second informal complaint on February 20, 2009 about cold temperatures in Cell C-619. Maintenance rechecked the vents and registered the temperature of the air emitted from the vents into the cell at 87 degrees.

On this evidence, the court cannot find any deliberate indifference to a serious risk of harm, as required to state an Eighth Amendment claim. Farmer, 511 U.S. at 835-37. Defendants have a system of regular checks and adjustments in place to ensure reasonably comfortable temperatures within the cells. Muwwakkil presents no evidence whatsoever that prison officials

knew between December 3, 2008 and January 20, 2009 that his cell was uncomfortably cold. Indeed, the temperature log indicates that the housing unit's overall temperature was normal during this period. Thus, he fails to demonstrate any deliberate indifference by any official during this period. Id. When Muwwakkil notified officials that his cell felt cold, they responded within a few days to check and adjust the vent. The court cannot find that this response was unreasonable so as to constitute deliberate indifference. Id. Moreover, Muwwakkil fails to present facts on which he could prove that the cold temperatures caused him any serious injury. Strickler, 989 F.2d at 1380-81.

At the most, Muwwakkil's submissions indicate that an official may have accidently closed, or forgot to reopen, the heat damper to his cell on occasion and that he suffered temporary discomfort. Prison officials' negligent actions do not violate an inmate's constitutional rights, even when that inmate suffers some harm as a result.[4] See Daniels v. Williams, 474 U.S. 327, 331-32 (1986) (finding that constitutional protections "are not triggered by lack of due care by prison officials"). The court will grant defendants' motion for summary judgment as to Claim 3.

### Claim 4: Property Limitations during Prayer Services

Muwwakkil alleges in Claim 4 that on February 27, 2009, officials "arbitrarily bann[ed him] from bringing any additional Islamic books, ink pen, and note paper, which is needed to facilitate Jumu'ah prayer services." He states that he, as imam of the Sunni community, needs certain items in order to conduct Jumu'ah services: "Islamic law books, Hadith books, prayer books, Arabic writing, Islamic prayer beads, prayer rugs, writing paper and pen for writing religious notes and prayer." He claims that denial of these items for use during prayer services

---

[4] Section 1983 was intended to protect only federal rights guaranteed by federal law and not tort claims, such as allegations of negligence, for which there are adequate remedies under state law. Wright, 766 F.2d at 849. Plaintiff's state law claims are thus not independently actionable under § 1983, and the court declines to exercise supplemental jurisdiction over them in this action. See 28 U.S.C. § 1367(c). All such claims will be dismissed without prejudice accordingly.

deprives him of his right to free exercise of his religious beliefs, in violation of the First Amendment and RLUIPA.

On March 8, 2009, Muwwakkil filed an informal grievance about being denied the right to bring such materials to the group prayer service, and on March 11, 2009, forwarded a regular grievance to the grievance coordinator, explaining the situation. The grievance coordinator rejected this grievance, because it was not filed within thirty days of the implementation of the applicable VDOC procedure, allowing inmates to bring only a Bible, Quran, or Muslim Prayer Ritual to group religious meetings. Muwwakkil appealed the rejection of his grievance as untimely, and the intake decision was upheld.[5]

Defendants' evidence indicates that the limitation on property at group religious services furthers important security needs. Correctional officers must search each general population inmate as he enters the designated meeting place for religious services. Because many inmates attend services, restricting the items they may carry with them enhances security and limits the movement of illegal contraband within the prison compound. Inmates who attempt to bring contraband into any religious service are not allowed to enter the service and must return to their assigned housing unit.

In deference to the expertise of prison officials in managing the difficult challenges of prison administration, even when a prison policy substantially burdens an inmate's ability to practice his religious beliefs, the policy withstands a First Amendment challenge so long as it is rationally related to furtherance of a legitimate governmental interest. O'Lone v. Estate of Shabazz, 482 U.S. 342, 349 (1987); Turner v. Safley, 482 U.S. 78, 89-91 (1987). In Turner, the Supreme Court identified four factors relevant to determining the reasonableness of a challenged

---

[5] Muwwakkil does not dispute defendants' evidence that he failed to file his grievance within 30 days of the implementation of the policy he challenged. Because his grievance was untimely under DOP 866 procedures, he failed to exhaust administrative remedies properly, as required under § 1997e(a). Defendants do not argue this affirmative defense, however. Moreover, as the court finds that defendants are entitled to summary judgment on the merits of the claim, the court will not rely on plaintiff's failure to comply with § 1997e(a) as grounds for dismissal of Claim 4.

prison regulation: (1) whether there is a "valid, rational connection" between the regulation and a legitimate and neutral governmental interest; (b) whether alternative means of exercising the asserted constitutional right remain open to inmates; (c) whether accommodating the asserted right will have a deleterious impact on prison staff, on other inmates, and on the allocation of limited prison resources; and (d) whether the regulation represents an "exaggerated response" to prison concerns, as reflected by the presence of less restrictive alternatives that impose only "de minimis cost to valid penological interests." Id. at 89-91.

RLUIPA prohibits governments from taking actions that impose a "substantial burden on the religious exercise of a person residing in or confined to an institution," unless the government demonstrates that imposition of that burden furthers "a compelling governmental interest" by "the least restrictive means." 42 U.S.C.A. § 2000cc-1(a)(1)-(2). Its protections apply to programs or activities that receive federal monies, such as the VDOC.[6] § 2000cc-1(b)(1); Lovelace v. Lee, 472 F.3d 174, 186 (4th Cir. 2006). Under RLUIPA, the inmate plaintiff bears the burden of proving that the challenged prison practice, or the denial of a religious accommodation, places a substantial burden on his exercise of sincere, religious beliefs. § 2000cc-2(b). Once plaintiff carries this burden, the government must prove that the imposition of the burden (or refusal to accommodate plaintiff's belief) furthers a compelling interest by the least restrictive means. Id.

As a key element of his free exercise claim, under either the First Amendment or RLUIPA, Muwwakkil must demonstrate that in taking a specific action, prison officials knowingly placed a substantial burden on his ability to practice his religious beliefs. See Lyng v. Northwest Indian Cemetery Protective Ass'n, 485 U.S. 439, 450 (1988) ("[I]ncidental effects of

---

[6]    The United States Court of Appeals for the Fourth Circuit has ruled that RLUIPA does not authorize claims for money damages against an official who is sued in her individual capacity in reliance on the Spending Clause facet of the statute. Rendelman v. Rouse, 569 F.3d 182, 189 (4th Cir. 2009). As Muwwakkil does not allege any facts suggesting that his RLUIPA claim could qualify under the alternative, Commerce Clause section of the statute, see § 2000cc-1(b)(2), his claims for monetary damages under RLUIPA are foreclosed by the Rendelman decision.

government programs, which may make it more difficult to practice certain religions but which have no tendency to coerce individuals into acting contrary to their religious beliefs" are insufficient to state a claim under Free Exercise Clause); Lovelace, 472 F.3d at 187 (defining RLUIPA term "substantial burden" to equate with Supreme Court's definition of that phrase for First Amendment claims as an official action that "puts substantial pressure on an adherent to modify his behavior and to violate his beliefs") (omitting citations). Officials' accidental or negligent actions that impinge to some degree on an inmate's religious practice are insufficient to support an actionable constitutional claim or RLUIPA claim. Id. at 194.

Under these principles, Muwwakkil's evidence does not support his claims that officials knowingly violated his religious rights. First, he fails to demonstrate that prison officials knew that denial of the requested property items at prayer services substantially burdened Muwwakkil's religious practice. His informal complaint and regular grievance simply stated that he needed these items to carry out his duties as imam, but did not give any religious basis on which the items were important to group prayer service.[7] Without knowledge that the property restriction substantially burdened Muwwakkil's religious practices, the defendants' alleged actions constituted nothing more than negligent interference with his beliefs and did not violate the First Amendment or RLUIPA. Id.

Moreover, defendants' evidence supports a finding that the security restriction limiting the amount of property an inmate may take to group religious services furthers compelling interests in maintaining security and facilitating efficient inmate movement. Allowing each inmate to possess only limited types of religious items while out of his cell for religious services lessens the chances of contraband movement and eases the process of searching each inmate as he enters or exits the religious service. Muwwakkil does not offer any less restrictive means of maintaining these security benefits. Id. at 186.

---

[7] Indeed, even now in his complaint, Muwwakkil fails to explain how lack of the stated items substantially burdens his religious practice.

Defendants also point to a VDOC restriction prohibiting inmates from being recognized as any type of clergy, such as an imam. Although an inmate may be designated to "lead" religious programs, such leaders cannot exercise authority over other inmates, and the leadership position is rotated regularly to prevent abuses. Defendants present evidence of events that caused them to believe Muwwakkil was abusing his leadership designation, beginning in February 2009, by asking inmates to entrust him with money, treating inmates differently within the religious service, and attempting to impose a gang-type organization among Sunni believers. See, infra, Claim 11. Muwwakkil's attempted explanation that the additional materials are necessary in his role as imam does not overcome defendants' compelling interests in enforcing the "no inmate clergy" policy to prevent gang-like organizations among inmates and in maintaining security during group prayer services through limiting the property items that inmates may possess there. Lovelace, 472 F.3d at 186. Finding no genuine issue of material fact in dispute, the court will grant defendants' motion for summary judgment as to Claim 4.

### Claims 5 & 6: In-Pod Religious Services

In Claim 5, Muwwakkil complains that although prison policy allows general population inmates to hold in-pod religious services whenever their pod is scheduled for outside recreation, officials allowed inmates in Muwwakkil's pod to hold in-pod religious services during recreation time only on Wednesday. He asserts that this policy violates the First Amendment, RLUIPA, and the Equal Protection Clause of the Fourteenth Amendment.

Claim 6 is related to Claim 5. Muwwakkil complains in Claim 6 that officials denied his request for permission to hold a large group study of the Arabic language in the gym for all Sunni inmates. Muwwakkil asserts that "[i]t is mandatory upon all Muslims to learn enough Arabic to read the Holy Qur'an and for the performance of the five (5) obligatory daily prayers." He proposed to prison administrators that Muslim inmates could meet for two hours, from 1:00 p.m. to 3:00 p.m. every Friday, for one hour to conduct the Jumu'ah prayer service and then for one hour to study Arabic. Prison officials said that the Muslims would be granted one hour of group

- 12 -

religious service time per week, just as other religious groups receive, and that the group could decide whether to pray or study Arabic or both during that time.

Neither of these sets of allegations states a free exercise claim under the First Amendment or RLUIPA. The record is clear that Muwwakkil can hold in-pod religious services on Wednesdays, can participate in a large group prayer service on Fridays, and can practice his religious beliefs in his cell at any time he is there. He and other Muslim inmates could also study Arabic, individually in their own cells or in small groups during in-pod religious services.[8] He offers no evidence that the obligation for a Muslim to learn Arabic must be carried out in a group setting. Similarly, he presents no evidence that his inability to participate in, or conduct, additional group religious services or a large group Arabic study "puts substantial pressure on [him as a Muslim] adherent to modify his behavior and to violate his beliefs." Lovelace, 472 F.3d at 187. Thus, he fails to demonstrate that defendants' actions have imposed a substantial burden on his religious practice so as to violate his rights under RLUIPA or the First Amendment. Accordingly, as to the free exercise aspect of Claim 5 and as to Claim 6 in its entirety, the court finds that defendants' motion for summary judgment must be granted.[9]

In his complaint itself, Muwwakkil does not explain why he believes the events alleged in Claim 5 state an equal protection violation. However, in the grievance appeals he attaches to this claim, he complains that in other general population pods at Wallens Ridge, inmates are allowed

---

[8] Muwwakkil asserts that the in-pod study time is not sufficient because not all in-pod Muslim groups include someone qualified to teach others Arabic. Muwwakkil has no standing, however, to bring claims under § 1983 to vindicate the rights of other inmates. See Hummer v. Dalton, 657 F.2d 621, 625-626 (4th Cir.1981) (holding a prisoner proceeding pro se may not serve as a "knight errant" for other inmates, but may only seek to enforce his own rights); Inmates v. Owens, 561 F.2d 560 (4th Cir. 1977) (to state civil rights claim, plaintiff must allege facts demonstrating that he himself has sustained, or will sustained, deprivation of right, privilege or immunity secured by the constitution or federal law). See also Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 166 (1972) (a litigant "has standing to seek redress for injuries done to him, but may not seek redress for injuries done to others").

[9] To the extent that Muwwakkil asserts that the present practice in his pod violates VDOC policy regarding in-pod religious services during outside recreation time, this aspect of his claim alleges nothing more than a violation of state law, which is not independently actionable under § 1983. Wright, 766 F.2d at 849. Because the court herein determines that summary judgment is appropriate as to plaintiff's federal claims, the court declines to exercise supplemental jurisdiction over any state law claims implicated in this action and will dismiss them without prejudice, pursuant to § 1367(c).

to hold in-pod religious services on any day when the pod is scheduled for outside recreation and that when he was housed in another pod, he took advantage of this practice. Therefore, he argues, officials' refusal to allow in-pod religious services during every outside recreation period violates equal protection principles.

To succeed on an equal protection claim, a plaintiff must first demonstrate that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination; once this showing is made, the court proceeds to determine whether the disparity in treatment can be justified under the requisite level of scrutiny. See Morrison v. Garraghty, 239 F.3d 648 (4th Cir. 2001). Proving discriminatory purpose requires more than a showing that officials were aware, or could have foreseen, that an action would adversely affect a particular classification of persons; rather, the plaintiff must show "that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of' its adverse effects upon an identifiable group." Personnel Administrator of Massachusetts v. Feeney, 442 U.S. 256, 279 (1979).

Muwwakkil's equal protection claim fails on the second prong of this analysis. Defendants offer evidence that prison policy authorizes group religious services only with visual supervision by staff and provides for inmates to conduct in-pod religious services during outside recreation time only on designated days, subject to staffing and security needs. The anecdotes Muwwakkil presents about inmates in other pods, including himself and presumably other Sunni Muslims, having been allowed in-pod religious services more than once a week suggest, at most, that sometimes the policy is not strictly enforced. He offers no evidence that such differences in enforcement, pod to pod, are the result of purposeful discrimination against an identifiable group. Accordingly, the court finds no genuine issue of material fact in dispute and will grant summary judgment for the defendants as to the equal protection aspect of Claim 5.

## Claim 7: Unsuitable Facilities for Religious Services

Muwwakkil alleges that on March 6 and March 13, 2009, prison officials moved the Sunni Muslim Jumu'ah prayer service from the gymnasium, where it is usually conducted, to two separate locations, which were dirty from being used to house the K-9 unit dogs during inclement weather and in which participants had no restroom facilities available for washing. At the same time, prison officials allowed a Christian group to utilize the more favorable gymnasium facilities. He asserts that these actions violated his rights under the First Amendment, RLUIPA, and the Equal Protection Clause.

Defendants' evidence indicates that twice each year, the Kairos Christian Organization conducts a revival at Wallens Ridge. These services, beginning on a Thursday and running through Sunday, are open to all inmates. The Kairos organization brings 40 to 50 volunteers, along with musical instruments, tables, and food for the services. Forty to 50 inmates attend each service. The gymnasium is the only room at the institution large enough to accommodate this group, their equipment, and the attendees. On March 6, 2009, the Kairos group was using the gymnasium for the revival. Instead of cancelling other religious group services that Friday, officials made two other program rooms available for Jumu'ah prayer services.

Because neither of these rooms was large enough to accommodate the entire Jumu'ah group, which could total as many as 88 inmates, officials put inmates from Housing Units A and B in one room and inmates from Housing Units C and D in the other room. Services proceeded in both rooms simultaneously. This temporary split of the Jumu'ah group also furthered security purposes by reducing inmates' ability to spread communication from unit to unit during religious services. Defendants state that the rooms were cleaned before the services and deny that K-9 unit dogs were housed in those rooms, because the dogs have an outside area in which to shelter during bad weather. Bathroom and washing facilities were not available in the two rooms. Officials' understanding was, however, that while cleanliness is encouraged before the Jumu'ah prayer service, it is not required in the prison setting and could be performed before inmates left their cells.

Muwwakkil fails to demonstrate that these accommodations of his religious beliefs violated any federally protected right. First, he fails to demonstrate that using the two program rooms for prayer services on two isolated occasions substantially burdened his religious practice. Lovelace, 472 F.3d at 187. He offers no evidence whatsoever that religious principles require Jumu'ah prayer service participants to wash during the service, rather than before leaving their cells to go to the service or that prayer services must be held in a clean facility. He also offers no support for his assertion that all Sunni Muslims at Wallens Ridge must conduct Jumu'ah prayers together in the same location every Friday. On the days mentioned, he was still able to celebrate the service with a group of fellow believers in keeping with his beliefs.[10] Because Muwwakkil fails to present evidence on which he could persuade a fact finder that the challenged conditions substantially burdened his religious practice as a whole or that they were imposed with any intention to affect his religious practice, defendants are entitled to summary judgment as a matter of law as to the First Amendment and RLUIPA portions of Claim 7. Lovelace, 472 F.3d at 187, 194 (finding that negligent infringement on inmates' religious practice does not violate First Amendment or RLUIPA).

Second, Muwwakkil fails to forecast evidence on which he could prove that the official decision to move the Muslim prayer service on two successive Fridays was the result of purposeful discrimination based on his religion or race. Muwwakkil does not offer evidence contradicting defendants' evidence that the temporary reassignment of rooms was based solely on the fact that the Kairos group could not physically conduct all aspects of its service in any other room besides the gymnasium. See also Chapman v. Reynolds, 378 F. Supp. 1137, 1140 (W.D. Va. 1974) (finding conclusory accusations that different treatment may have been motivated by race to be insufficient to state § 1983 discrimination claim). As Muwwakkil fails to allege facts from which a reasonable fact finder could find the necessary elements of an equal

---

[10] As stated, Muwwakkil cannot litigate on behalf of the Sunni inmates who had to conduct Jumu'ah prayers on two occasions without a designated imam present. Hummer, 657 F.2d at 625-626.

protection claim here, see Morrison v. Garraghty, 239 F.3d at 654, defendants are also entitled to summary judgment on this aspect of Claim 7.

### Claim 8: Ventilation Problems

Muwwakkil alleges in this claim that since February 2009 and ongoing, the defendants have exposed him to hazards posed by "an unsanitary ventilation system that continuously emits unidentifiable lint and dust particles." He alleges that long-term exposure to these particles has caused him to suffer from "chronic headaches, mucus full of dust and lint, [and] throat irritation, all of which has deprived [him] of adequate sleep." He first informed prison officials about the ventilation system on February 15, 2009 by filing an informal complaint. An official responded that the lint filter for the system had been changed on February 4, 2009 and that supply and return systems had been checked and were "OK." Muwwakkil then filed a regular grievance on February 24, 2009, advising that the only way to correct the problem was to vacuum the particles out of the ventilation system. The officials who reviewed the grievance and subsequent appeals ruled it to be unfounded, given the evidence that the system had been checked and the filter had been recently changed. Muwwakkil claims that the dust and lint particles accumulate on surfaces in his cell and pose a sanitation hazard.

Defendants offer evidence that filters for the prison ventilation system are changed every three months to maintain the efficiency of the system. In 2008, the air filters in all housing units were changed in February, April, July, and October. In 2009, the filters were changed in February and then, after a check in April indicated that no change was required, the filters were changed in June and August 2009.

Muwwakkil filed a request for medical services on March 26, 2009, and a nurse examined him during sick call. He told her he had been having headaches and his nose felt congested, allegedly from an allergy to dust. The nurse noted that he was alert and oriented and denied fever, chills, nausea, or vomiting. The nurse gave him Tylenol and an antihistamine medication for five days. A nurse examined Muwwakkil again on April 3, 2009 during sick call,

when he informed her that the medicine did not help and that he was still coughing up "yellow stuff." He denied having fever, chills, nausea, or vomiting. On April 6, 2009, Dr. Thompson examined Muwwakkil, noted sinus congestion, diagnosed chronic sinusitis, and prescribed a nasal spray for 60 days. Muwwakkil used this spray for two weeks and then quit, because he did not find it to be effective.

In the face of defendants' uncontradicted evidence concerning maintenance of the ventilation system during the period in question, Muwwakkil fails to demonstrate that prison officials failed to respond reasonably to whatever risk of harm the ventilation system posed. Farmer, 511 U.S. at 835-37. Moreover, Muwwakkil fails to present any evidence on which he could demonstrate that he has suffered, or is likely to suffer, any serious injury as a result of the alleged dust and lint in the ventilation system. After trying the prescribed nasal spray for two weeks, he does not allege seeking any additional medical treatment for his headaches and nasal congestion. In addition, he offers no evidence whatsoever on which he could prove that these minor discomforts were caused by the alleged ventilation problems. For the stated reasons, the court finds no genuine issue of material fact in dispute as to any claim of unconstitutional living conditions and will grant defendants' motion for summary judgment as to this portion of Claim 8.

Muwwakkil also fails to state any claim here regarding medical treatment. To prove that his course of medical treatment in prison amounted to a violation of the Eighth Amendment, an inmate must show that personnel to whose care he was committed exhibited "deliberate indifference" to his "serious medical needs." Estelle v. Gamble, 429 U.S. 97, 104-105 (1976). A claim concerning a disagreement between an inmate and medical personnel regarding diagnosis and course of treatment does not implicate the Eighth Amendment except in extraordinary circumstances. Wright, 766 F.2d at 849. Questions of medical judgment are not subject to judicial review. Russell v. Sheffer, 528 F.2d 318 (4th Cir. 1975). Moreover, mere malpractice or negligence in diagnosis does not state a federal claim. Estelle, 429 U.S. at 105-106.

Muwwakkil's allegations indicate that the nurse and doctor examined, diagnosed, and treated his conditions in the manner they saw fit, pursuant to their medical judgments. Such medical judgments are not subject to judicial review under § 1983. Russell, 528 F.2d at 318. Muwwakkil simply disagrees with the treatments provided and alleges that they were inadequate to solve his problem. This allegation of negligent diagnosis and treatment is not sufficient to support a constitutional claim.[11] Estelle, 429 U.S. at 105-106. Therefore, the court will grant defendants' motions as to Muwwakkil's § 1983 claim that he received inadequate medical treatment.

### Claim 9: Retaliatory Job Loss

In Claim 9, Muwwakkil complains that officials deprived him of a prison job in retaliation for his filing a grievance. He alleges the following sequence of events on which he bases this claim. After he had been assigned to D-6 pod for several weeks, in early October 2008, Sgt. King arranged for Muwwakkil to work as a housekeeper in the pod. On October 23, 2008, however, King came to Muwwakkil's cell and asked him to drop a grievance he had filed on an unidentified subject. When the inmate refused to drop the grievance, King was angry. On December 18, 2008, Muwwakkil was notified that he was moving to C-6 pod. He asked Sgt. King about a commissary order that was to be delivered later that day, and King said, "You are no longer my problem." On January 5, 2009, Muwwakkil asked that his housekeeping job be transferred, since the new pod had several openings. The lieutenant informed him that jobs do not transfer between pods.[12] When Muwwakkil renewed his request a few days later, another lieutenant informed him that he did not need any other housekeepers in C-6 pod at that time,

---

[11] To the extent that Muwwakkil's allegations may give rise to claims of medical negligence under state law, the court declines to exercise supplemental jurisdiction over such claims, pursuant to 28 U.S.C. § 1367(c), and will dismiss them without prejudice.

[12] Defendants' evidence indicates that when an inmate is transferred to a new pod, the job that he had in his former pod then becomes available for an inmate who still resides in that pod. The transferred inmate may apply for jobs in his new pod as they become available.

because there was not enough work. Muwwakkil alleges that he knows of other inmates whose jobs transferred with them when they were moved to new pods, contrary to policy.[13]

In order to state a § 1983 retaliation claim, the "plaintiff must allege either that the retaliatory act was taken in response to the exercise of a constitutionally protected right or that the act itself violated such a right." Adams v. Rice, 40 F.3d 72, 75 (4th Cir. 1994). He must allege specific facts supporting his claim that adverse actions were retaliatory; bare assertions of retaliation do not establish a claim of constitutional dimension. Id. Because inmates do not have a constitutional right to a prison grievance procedure, their utilization of an existing grievance procedure does not constitute exercise of a federally protected right so as to support a § 1983 retaliation claim. Id. Similarly, inmates have no constitutional right to a prison job, and for that reason, deprivation of a prison job states no independent constitutional claim. See, e.g., Bulger v. United States Bureau of Prisons, 65 F.3d 48 (5th Cir. 1995).

Under these principles, Muwwakkil's allegations do not satisfy the necessary elements of the retaliation claim he seeks to bring here. In using the grievance procedure, he was not exercising a constitutionally protected right. Moreover, because he has no constitutional right to a prison job, his loss of the job itself was not a constitutionally significant deprivation. Furthermore, his allegations that his transfer and job loss were retaliatory are merely conclusory. He alleges no facts indicating that Sgt. King, who asked him to drop the grievance, was personally involved in any way in the decisions regarding the transfer or the job assignments in the new pod. Moreover, anecdotal evidence that some inmates keep their jobs after a transfer, in contravention of policy, does not support a claim that officials retaliated against Muwwakkil when they failed to violate policy so as to allow him to keep his job after a pod transfer. The court will grant defendants' motion for summary judgment as to Claim 9 in its entirety.

---

[13] Defendants' evidence indicates that Muwwakkil transferred to a segregation pod on April 27, 2009, and obtained a job as a houseman in that unit beginning on July 16, 2009 and on September 17, 2009, became a barber for that unit.

## Claim 10: Confiscated Religious Materials

In this claim, Muwwakkil alleges that on February 7, 2009, while investigating allegations that he was violating prison policies prohibiting organization of group demonstrations, officials searched his cell and confiscated a stack of paperwork, including legal, personal, and religious items. The officers told him that the investigator needed to review the documents, but that they would be copied and returned to Muwwakkil. The inmate signed and was given a copy of a confiscation notice. After waiting several days, Muwwakkil filed an informal complaint seeking return of his materials. An officer replied to the complaint, stating that the materials had been returned. On February 19, 2009, Muwwakkil filed a grievance, complaining that his materials had not been returned. An officer responded, stating that Muwwakkil's property file did not include a confiscation notice for the missing materials. The materials were not returned, and Muwwakkil alleges that they were lost, stolen, or wrongfully destroyed, contrary to prison policies regarding the handling of prisoners' personal property.

Allegations that prison officials randomly deprived an inmate of his property, whether intentionally or as a result of negligence, do not state any constitutional claim "if a meaningful post-deprivation remedy for the loss is available." Hudson v. Palmer, 468 U.S. 517, 533 (1984). Inasmuch as Muwwakkil possessed tort remedies under Virginia state law to be reimbursed for the monetary value of the destroyed materials, see Virginia Code § 8.01-195.3, it is clear that he cannot prevail in a constitutional claim for the alleged property loss in this case. The fact that the officers allegedly failed to follow prison procedures so as to allow Muwwakkil to appeal the confiscation and loss of his materials states nothing more than a violation of state law, which is not actionable under § 1983, Wright, 766 F.2d at 849, and the court declines to exercise supplemental jurisdiction over such claims, pursuant to § 1367(c)(1). Accordingly, Claim 10 must be dismissed, pursuant to § 1915A(b)(1).

## Claim 11: Removal from Jumu'ah List

### A. Muwwakkil's Allegations

Muwwakkil alleges in Claim 11 that in April 2009, officials arbitrarily removed him from the list of inmates approved to attend group Jumu'ah prayer services in the gymnasium, in retaliation for Muwwakkil's involvement in persuading VDOC officials to change the Jumu'ah prayer times. He also asserts that removal from the group services approval list violates his right to free exercise of his religious beliefs.

In support of his retaliation claim, he points to the following sequence of facts. After Muwwakkil's election as imam in December 2008, he immediately began his campaign of grievances and letters to public officials, in an effort to have the Jumu'ah prayer time changed to 1:00 p.m. to 2:00 p.m. on Fridays. On February 6, the warden told Muwwakkil that officials had obtained letters indicating that the Sunni Muslims and the Bloods (a street gang) were uniting to stage a demonstration. Muwwakkil denied any such plan and asked the warden to change the prayer times. The warden refused. The next day Muwwakkil's cell was searched and written materials were confiscated for the investigation of gang activity.

In the following weeks, according to Muwwakkil, the warden defended his change of Jumu'ah prayer times in a letter to the VDOC central office, arguing that any different schedule would affect his need to conduct an efficient midday count. Meanwhile, Muwwakkil wrote multiple letters to the Islamic Center and other public officials about the Jumu'ah prayer time change at Wallens Ridge. On March 19, 2009, Muwwakkil asserts, VDOC officials ordered the warden to change the Jumu'ah prayer time to 1:00 p.m. to 2:00 p.m., effective March 20, 2009. Ten days later, on March 30, 2009, officials charged Muwwakkil with disciplinary charges related to the gang activity investigation, transferred him to segregation, and requested that he be transferred to Red Onion State Prison. On April 3, 2009, Muwwakkil's name was removed from the approved list for attendance of Jumu'ah group prayer services. He alleges that the Jumu'ah prayer service cannot be conducted individually.

## B. Defendants' Evidence

On February 2, 2009, prison officials obtained information that, in violation of VDOC policy, Muwwakkil had been organizing inmates for various jobs and ranks within the housing units and had established an outside bank account where Sunni Muslim inmates could send money. Investigators searched Muwwakkil's cell on February 7, 2009 and removed and copied documents later used to confirm that he had opened a post office box to which other inmates were sending money. Investigators also determined that offenders were bringing stamps into the prayer service along with written agreements to repay any stamps borrowed. Staff observed that on a weekly basis during the Jumu'ah services, visitors were required to sit in the back of the gym, while the Sunni community members sat in front. Community members were required to vote to allow a visitor to be accepted into the community. Certain inmates in each pod were required to report to Muwwakkil in writing on how the "mood" in the pod was and how community members were doing.

As stated, VDOC policy prohibits recognition of any offender as a spiritual leader, such as an imam. Prison officials would allow an outside volunteer imam to lead the group at Wallens Ridge, but have not been able to find one. While inmates are sometimes authorized to lead others in a religious service or study group, under the supervision of prison staff, such leader inmates cannot exercise any authority over other inmates. Prison staff determined that Muwwakkil's activities as imam represented a clear attempt to organize offenders into a paramilitary, gang-like system, in violation of prison security policies.

After the investigation revealed this information, the warden and two Wallens Ridge sergeants went to the gym after the Jumu'ah service on February 6, 2009 to speak with Muwwakkil and four or five other inmates. The warden told Muwwakkil that the organizational activities he was conducting among the Sunnis were considered to be inappropriate gang activities that needed to stop. Muwwakkil denied that he was involved in any such activities.

In March 2009, as stated, the scheduled times for Jumu'ah prayer services went from the 12:00 p.m. to 1:00 p.m time frame, applicable during the fall and winter months, to the spring and summer meeting time of 1:00 p.m. to 2:00 p.m. Defendants' evidence appears to indicate that the change to this revolving schedule occurred in November 2008 as a result of requests from two Sunni Muslim representatives at Wallens Ridge and in keeping with guidance VDOC officials had received from its Islamic Center advisor. On the spring/summer schedule, the mandatory 1:30 p.m. inmate count is conducted by counting inmates while they are attending religious services. Officers require each inmate to present his ID card, his name, his inmate number, and his bed assignment so that staff can account for each person.

On March 25, 2009, prison officials charged Muwwakkil with a disciplinary offense, Code #251, the unauthorized transfer of funds. This charge was based on information indicating that Muwwakkil had established an outside savings account and a post office box under the name of "Aiesha Mitchell." Records indicated that other inmates had forwarded money from their trust accounts to this outside bank account. On March 25, 2009, a $30 money order from "Aiesha Mitchell" was credited to Muwwakkil's inmate trust account. After a disciplinary hearing, Muwwakkil was found guilty of the disciplinary offense and was penalized with a $5.00 fine.

On April 3, 2009, Muwwakkil was removed from the Jumu'ah prayer list at the request of the warden.[14] Removal of an inmate from a religious activity list occurs only when officials have

---

[14] In response to Muwwakkil's informal complaint about being removed from the list, the treatment program supervisor stated:
> YOU WERE REMOVED FROM THE FRIDAY JUMAH SERVICE DUE TO MANY REPEAT VIOLATIONS OF DEPARTMENT POLICIES RELATED TO ALLOWED ACTIVITIES AT SERVICES AS WELL AS OFFENDER MONEY TRANSACTIONS. PREVIOUSLY WARDEN WATSON HAD DISCUSSED THESE MATTERS WITH YOU AND YOU INFORMED THE WARDEN YOU WERE NOT INVOLVED IN SUCH POLICY VIOLATIONS NOR WOULD YOU IN THE FUTURE. HOWEVER, YOU WERE FOUND TO HAVE SEVERAL VIOLATIONS. WHILE YOU ARE NOT APPROVED TO ATTEND THE FACILITY JUMAH SERVICE ON FRIDAYS YOU MAY STILL PRACTICE YOUR RELIGION AS ALLOWED IN YOUR HOUSING POD AND/OR YOUR CELL.

(Docket Entry (DE) 1, p. 144.) In response to Muwwakkil's regular grievance, the next step in the VDOC procedures, the warden's office summarized the investigation into the inmate's creation of ranks and rules among the Sunni inmates, his creation of the outside bank account to collect money from group members, and his other acts of control over other inmates, in violation of VDOC policy. (DE 1, p. 145.)

documented evidence showing that the inmate is a threat to the safety of other persons involved in that activity or that the activity itself disrupts the order of the facility.

Prison officials charged Muwwakkil with a second disciplinary offense on April 27, 2009 for participating in or encouraging others to participate in a group demonstration. That day, officials confiscated five letters from an inmate who was attending Department of Corrections Education classes. The institutional investigator determined that the letters had been written by Muwwakkil, addressed to various inmates on the compound. One of the letters, dated April 21, 2009 and addressed to "Asst. Imam" Hamzah" stated:

> Tell all of the brothers that I appreciate their cards and letters and encouraging words, Hamzah will discuss a mass filing with you, for those who say they support their imam show it by filing a complaint, writing a letter, etc. Have the legal committee present when you and the Amir discuss this issue.

(DE 31, Watson Aff. ¶ 11.) Based on this statement, prison staff determined that Muwwakkil was encouraging others to participate in a group demonstration and placed him in pre-hearing detention/segregation. On May 5, 2009, he was found guilty of this offense and was penalized with 30 days in isolation. Segregation inmates are not permitted to participate in group meetings, but may practice their religious beliefs in their cells.

After Muwwakkil completed his isolation sentence for the April 2009 disciplinary offense, he remained in segregation pending approval for a transfer to Red Onion State Prison. In December 2009, prison officials determined that he did not meet the requirements for assignment to Red Onion and returned him to the general population at Wallens Ridge, where he could send a request to the Treatment Program Supervisor to be placed on the list to participate in the Jumu'ah prayer service again.

---

The response stated that "[b]ecause of these unauthorized actions, and [his] actions in attempting to control other offenders, it was determined [his] actions presented serious security concerns that endangered other offenders and staff" and as a result, he would not be allowed to attend group religious services. (Id.) While he was in the general population, he was allowed to practice his religious beliefs in the housing pod, as long as he did not pose a security risk to other offenders and staff in so doing. (Id.)

## C. Allegations of Retaliation

Muwwakkil asserts that his success in changing Jumu'ah prayer times made the warden angry and in retaliation, the warden removed Muwwakkil from the list to attend group services "in order to marginalize [his] authority and influence over the Muslim prisoners." Muwwakkil denies participating in any gang-like activity. He does admit that, as imam, he organized the Sunni Muslim group into ranks, encouraged other inmates to file complaints, and established an outside bank account. He defends this activity as appropriate for an imam. He states that "Islam is an organized and structured way of life. Any Masjid (mosque) or Islamic center will have a similar organizational structure." (DE 43, p. 4.) He excuses the outside bank account, based on its purported purpose to purchase Islamic books and other educational materials for the Sunni Muslim community at Wallens Ridge. He admits that he encouraged other inmates to file informal complaints about officials' treatment of Muwwakkil as imam, but he denies that this activity constituted "encouraging others to participate in a group demonstration."

The court finds no evidence on which Muwwakkil could persuade a reasonable fact finder that officials revoked permission for his participation in group religious services in retaliation for his efforts to change the time of the prayer service. He fails to offer any documentation refuting defendants' evidence that the time change in November 2008 contemplated that the prayer service time would change again for the spring and summer months. He also submits no documentation whatsoever in support of his allegation that the March 2009 change in the prayer service time resulted from his own letter campaign or that the warden was angered by this time change. Moreover, Muwwakkil admits to the behavior that officials identified as the reason for his removal from the Jumu'ah group prayer service list: his efforts to exercise his designation as imam to exert control over other inmates, organize them into ranks, collect money from them, and encourage them to conduct a group demonstration. His own characterization of these activities as a necessary part of an imam's responsibilities does not change the fact that these activities violated VDOC security policy and as such, supplied legitimate grounds for his

removal from the list, without any relationship whatsoever to his advocacy of a schedule change for prayer services. As he thus fails to establish the motive aspect of his retaliation claim, Adams, 40 F.3d at 75, the court concludes that defendants are entitled to summary judgment on this element of Claim 11.

### C. Free Exercise

Muwwakkil also states that his removal from the prayer service list "violated his established constitutional rights to exercise his faith free from undue interference" and that the defendants' action "erroneously and with malicious intent created a substantial burden to [his] religious worship," causing him to suffer "sleep deprivation, headaches, mental anguish, and depression." He alleges that he cannot conduct Jumu'ah prayer services on an individual basis, but offers no religious documentation in support.

Given the evidence that group Jumu'ah prayer services are an integral part of Sunni Muslim worship, the court will assume without finding that barring Muwwakkil from the group service substantially burdened his religious practice. Nevertheless, the court concludes that this official action did not violate his federally protected rights to exercise his beliefs.

Under the First Amendment, an official action that burdens an inmate's religious practice is constitutionally permissible if it is rationally related to furtherance of a legitimate penological interest, such as the need to maintain security and order. O'Lone, 482 U.S. at 349; Turner, 482 U.S. at 89-91; see also In re Long Term Admin. Segregation of Inmates Designated as Five Percenters, 174 F.3d 464, 468 (4th Cir. 1999) (upholding South Carolina prison policy designating Five Percenters as prison security threat group (STG) and requiring that STG members remain in long-term segregated confinement where group religious services were not permitted). The defendants' decision to bar Muwwakkil from Jumu'ah services was reasonable in consideration of the four factors identified in Turner, supra: (1) a valid and rational connection existed between his removal from services and his unauthorized organizational and financial activities, many aspects of which were planned or implemented during group prayer

services; (2) he retained the ability to exercise his religious beliefs in other ways, such as conducting small group services in the pod or praying and studying on his own in his cell; (3) allowing him to continue attending Jumu'ah services would potentially have had an adverse impact on his Sunni Muslim cohorts and staff, if he continued abusing his self-endowed authority as imam in ways that violated prison policies and threatened prison security, which would require further expenditure of resources to police his actions with the group; and (4) barring him from the prayer services was a focused solution for, and not an exaggerated response to, the identified security threats his documented behavior had posed. Id. at 89-91. Based on the foregoing, the court finds no genuine issue of material fact as to Muwwakkil's First Amendment claim and will grant defendants' motion for summary judgment as to this portion of Claim 11.

To prove that an official action which substantially burdens an inmate's religious practice is lawful under RLUIPA, prison officials must demonstrate that the official action furthers "a compelling governmental interest" by "the least restrictive means." § 2000cc-1(a)(1)-(2). On this justification element of a RLUIPA claim, the government bears the burden of proof. Lovelace, 472 F.3d at 186. Prison security needs are well established as compelling interests for purposes of a RLUIPA analysis. See, e.g., Cutter v. Wilkinson, 544 U.S. 709, 723 (2005) ("Lawmakers supporting RLUIPA were mindful of the urgency of discipline, order, safety, and security in penal institutions.") (citation omitted).

Applying these principles here, the court concludes that defendants have established that the security interests furthered by barring Muwwakkil from further attendance of the group prayer services were compelling. Under the guise of religious leadership and despite staff oversight during services, Muwwakkil urged fellow believer inmates to violate prison policies regarding inmate finances and group demonstrations. Furthermore, given the powerful, adverse influences of gangs among the prison population, officials' interest in preventing any gang-type ranking of group members is also a compelling security goal. See Five Percenters, 174 F.3d at 466-70 (regarding dangers of purportedly religious gang influence). Removing only Muwwakkil

from the prayer service list limited his ability to exercise his purported religious authority or to structure other inmates' positions among the general population to the same extent in the future, while at the same time allowing him to exercise his personal religious beliefs in his housing unit and his cell. Indeed, Muwwakkil offers no less restrictive means by which prison officials could have accomplished their security goals in this situation. Finding no genuine issue of material fact in dispute, the court will grant defendants' motion for summary judgment as to the RLUIPA portion of Claim 11.

### Claim 12: Inadequate Food Portions

In this claim, Muwwakkil alleges that the food portions he received, while on the vegetarian alternative menu in the segregation unit at Wallens Ridge, were smaller than the portions prescribed by the VDOC master menu, which caused him to loose weight. He alleges the following facts in support. On April 27, 2009, when he was transferred into the segregation unit, officers weighed him at 210 pounds. On May 6 and 10, 2009, Muwwakkil wrote complaints to the kitchen staff, stating that the portions he was receiving on the vegetarian/meat alternative diet were inadequate and that he was losing weight. He received no response. On May 16, 2009, as he was exiting the shower, officers weighed him at 186 pounds. Muwwakkil wrote another complaint about the food on May 25, 2009. He received this response from the food service director on May 27, 2009:

> All beans are measured with a 12 oz. spoodle [sic]. I frequently monitor the bean portions and have not found any discrepancies. I have checked recipes against pull sheets and the proper amounts of beans are being prepared. I check with the cooks and all beans are being cooked. Unless you['re] eating everything on your tray, you will not receive all the allotted calories.

In response to the defendants' motion for summary judgment, Muwwakkil provides additional facts in support of the claim. On October 20, 2009, Dr. Thompson examined Muwwakkil for a complaint about a fungal infection. The doctor weighed Muwwakkil that day at 183 pounds. He noted that the inmate expressed concerned about weight loss and that he was

housed in the segregation unit. When Muwwakkil was released from segregation on December 15, 2009, officers weighed him at 178 pounds.

Muwwakkil also submits declarations, written in his handwriting and signed by 19 other inmates under penalty of perjury, indicating that they believe the food portions served in segregation are nutritionally inadequate and that each of them has suffered "extreme weight loss, fatigue, and hunger headaches." He presents seven declarations, written in his handwriting and signed by other inmates under penalty of perjury, indicating that as former or current kitchen employees, these inmates believe the food portions served are inadequate and have seen food service supervisors "routinely monitor and instruct prison kitchen employees to serve inadequate portions" to save money. Muwwakkil asserts that although the master menu provides for 2800 calories per day per inmate, the portions he received in segregation totaled only 1500 to 1800 calories daily. As a result of the inadequate portions, Muwwakkil claims that he not only lost weight, but also suffered "muscle atrophy, hunger headaches, and sleep deprivation."

Defendants offer the following evidence. A master menu sets out the various meal plans provided to VDOC inmates of different dietary needs and sets out the portion sizes that each inmate is to receive for each meal. A registered dietician ensures that the VDOC's master menu meets the nationally recommended allowances for basic nutrition and reviews the menus semi-annually. All VDOC facilities are to follow the master menu and adhere to the portions as indicated in each individual menu. Food service managers at the prison facilities must conduct meal evaluations at least quarterly to verify that the meals they are serving adhere to the basic daily servings as outlined in the master menu.

The average daily calorie count for three meals from the master menu averages 2700 to 2800 calories. Inmates in the general population may also purchase food items from the commissary, but inmates confined in the segregation unit do not have commissary privileges. Accordingly, while Muwwakkil was in segregation and could not purchase commissary food

items, he would have had to eat all the items on his meal trays in order to obtain the full 2700 to 2800 calories per day.

While in segregation, staff members weigh inmates once per month and direct any concerns to the medical department for evaluation. Muwwakkil could also file a sick call request if he had any health concerns while in the segregation unit. During the October 20, 2009 visit with Dr. Thompson, the doctor noted that the inmate was concerned about weight loss, but did not note any complaint the inmate had about his meals or diet. The medical records do not indicate that Muwwakkil made any other complaints to medical staff about his weight loss or related health concerns during his stay in segregation. According to the body mass index charge issued through the National Institute of Health, 182 pounds is a healthy weight for a man of Muwwakkil's height.[15]

> It is well established that
>
> extreme deprivations are required to make out a conditions-of-confinement claim. Because routine discomfort is part of the penalty that criminal offenders pay for their offenses against society, only those deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation.

Hudson v. McMillian, 503 U.S. 1, 9 (1992) (internal quotations omitted). Thus, "for prison conditions to rise to the level of unconstitutional punishment, there must be [objective] evidence of a serious medical and emotional deterioration attributable to the challenged condition." Strickler, 989 F.2d at 1380. In addition, to satisfy the subjective element of a conditions claim, there must be evidence that prison officials knew a substantial risk of harm existed and failed to respond reasonably to that risk. Farmer, 511 U.S. at 835-37.

The court finds no genuine issue of material fact in dispute as to either aspect of Muwwakkil's claim. Taking the facts in the light most favorable to him, he demonstrates that after his transfer to segregation, he lost 24 pounds in the first three weeks and a total of 32

---

[15] Defendants indicate that the most recent weight in Muwwakkil's records at the time they filed their motion for summary judgment was 182 pounds, as recorded on November 4, 2009.

pounds over seven and a half months. He also presents evidence that, in his opinion as corroborated by the opinion of some other inmates in segregation, food portions served are sometimes smaller than the portion sizes set forth on the master menu. In the face of defendants' evidence, however, Muwwakkil's allegations and documentation are not sufficient to present any genuine issue of material fact in dispute.

First, nothing in the record indicates that the diet served to Muwwakkil in segregation caused him to suffer any "serious medical and emotional deterioration." The discomforts he allegedly suffered while in segregation were not severe enough to motivate him to seek medical treatment, as defendants' evidence indicates that he never filed a sick call request concerning his weight loss or the other symptoms of which he now complains. Defendants' evidence also indicates that even after losing nearly 30 pounds over several months' time in 2009, Muwwakkil maintained a healthy weight for a man of his height.

Second, Muwwakkil's evidence is insufficient to prove by a preponderance of the evidence that his weight loss is attributable to smaller portions on the meal trays in segregation. Other than his own opinion and the purported opinions of his affiants, he fails to explain any method by which he and these other inmates were able to measure the food portions being served or to calculate with any precision the number of calories included in the three daily meals. Moreover, other factors existed that likely contributed to the weight loss Muwwakkil experienced in segregation, such as the lack of access to commissary food items to supplement the menu meals and his admitted disinclination to exercise in the recreation cages supplied for segregation inmates.[16]

Third, the record as a whole does not support a claim that the defendants named in Claim 12 have acted with deliberate indifference to inmates' dietary needs. As stated, Muwwakkil does not complain that the VDOC master menu, for which Chief Dietician Linda Shear is responsible,

---

[16] Although each of the affiant inmates claims to have experienced "extreme weight loss" while in segregation, none of them provides specific information charting the amount of weight lost or over what period of time.

is nutritionally insufficient, nor does he allege that she was personally involved with the meal trays served to him at Wallens Ridge. Accordingly, she is entitled to summary judgment as to Claim 12.

Regional Director Garman, Warden Watson, and Assistant Warden Harvey, although they may have received notice through the grievance procedure of Muwwakkil's complaint about smaller food portions and weight loss, also have no personal involvement in meal service. Through the food service director's response to Muwwakkil's complaint, however, these supervisory officials learned that the food service manager, Defendant Scarberry, was taking reasonable measures to verify that segregation inmates obtained appropriate nutrition, such as inmate kitchen workers using specialized tools, like the spoodle, to measure food portions and Scarberry's own checks on procedures to ensure that the portion sizes being served match the portions dictated by the master menu.[17] Garman, Watson, and Harvey reasonably relied on Scarberry's expertise as a food service manager to resolve the issues raised in Muwwakkil's grievances.[18] See, e.g., Miltier v. Beorn, 896 F.2d 848, 855 (4th Cir. 1990) (finding that prison personnel may rely on the opinion of the medical staff as to the proper course of treatment). Moreover, Muwwakkil offers no evidence whatsoever that Scarberry herself orders kitchen workers to skimp on portions to save money or that she knew of such behavior by other supervisors and allowed it to continue without taking any action to alleviate the problem. For the stated reasons, the court concludes that Muwwakkil's evidence does not establish a § 1983 claim against Garman, Watson, Harvey, and Scarberry, and will grant their motion for summary judgment as to Claim 12.

---

[17] Muwwakkil asserts that Scarberry's response to his request was "misleading and inaccurate," but offers no evidence that she failed to take the precautions she mentioned in her response.

[18] The mere fact that the defendants did not respond to Muwwakkil's grievance in the manner that he would have preferred does not state any constitutionally significant claim, because inmates have no right to a grievance procedure in the first place. Adams, 40 F.3d at 75.

### III. Conclusion

For the stated reasons, the court concludes that Muwwakkil fails to establish any genuine issue of material fact in dispute as to any of his § 1983 claims, and therefore, defendants' motions must be granted. Any state law claims will be dismissed without prejudice, pursuant to § 1367(c). An appropriate order will issue this day.

The plaintiff is advised that he may appeal this decision pursuant to Rules 3 and 4 of the Federal Rules of Appellate Procedure by filing a notice of appeal with this court within 30 days of the date of entry of this memorandum opinion and the accompanying order, or within such extended period as the court may grant pursuant to Rule 4(a)(5).

The Clerk is directed to send copies of this memorandum opinion and accompanying order to plaintiff and counsel of record for the defendants.

ENTER: This 13th day of September, 2010.

_____
Chief United States District Judge